# VICTOR *v.* NEBRASKA

No. 92–8894.   Argued January 18, 1994—Decided March 22, 1994*

---

*Together with No. 92–9049, *Sandoval* v. *California,* on certiorari to the Supreme Court of California.

1

2

O'CONNOR, J., delivered the opinion for a unanimous Court with respect to Part II, and the opinion of the Court with respect to Parts I, III, and IV, in which REHNQUIST, C. J., and STEVENS, SCALIA, KENNEDY, and

4

THOMAS, JJ., joined in full and in which GINSBURG, J., joined as to Parts III–B and IV. KENNEDY, J., filed a concurring opinion, *post*, p. 23. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 23. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in all but Part II of which SOUTER, J., joined, *post*, p. 28.

*Mark A. Weber* argued the cause and filed briefs for petitioner in No. 92–8894. *Eric S. Multhaup*, by appointment of the Court, 510 U. S. 942, argued the cause for petitioner in No. 92–9049. With him on the briefs was *Kathy M. Chavez*.

*Don Stenberg*, Attorney General of Nebraska, argued the cause for respondent in No. 92–8894. With him on the brief was *J. Kirk Brown*, Assistant Attorney General. *Daniel E. Lungren*, Attorney General of California, argued the cause for respondent in No. 92–9049. With him on the brief were *George Williamson*, Chief Assistant Attorney General, *Carol Wendelin Pollack*, Senior Assistant Attorney General, and *Susan Lee Frierson*, *Sharlene A. Honnaka*, *Donald E. De Nicola*, and *Sharon Wooden Richard*, Deputy Attorneys General.†

---

†Briefs of *amici curiae* urging affirmance in both cases were filed for the United States by *Solicitor General Days*, *Assistant Attorney General Harris*, *Deputy Solicitor General Bryson*, and *Paul J. Larkin, Jr.*; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson*.

Briefs of *amici curiae* urging affirmance in No. 92–9049 were filed for the Commonwealth of Massachusetts et al. by *Scott Harshbarger*, Attorney General of Massachusetts, and *Pamela L. Hunt* and *Gregory I. Massing*, Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *James H. Evans* of Alabama, *Larry EchoHawk* of Idaho, *Pamela Carter* of Indiana, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Michael F. Easley* of North Carolina, *Lee Fisher* of Ohio, *Theodore R. Kulongoski* of Oregon, *Ernest D. Preate, Jr.*, of Pennsylvania, *T. Travis Medlock* of South Carolina, *Charles W. Burson* of Tennessee, and *Elizabeth Barrett-Anderson* of Guam; and for the California District Attorneys' Association by *Gil Garcetti* and *Brent Riggs*.

JUSTICE O'CONNOR delivered the opinion of the Court.*

The government must prove beyond a reasonable doubt every element of a charged offense. *In re Winship*, 397 U. S. 358 (1970). Although this standard is an ancient and honored aspect of our criminal justice system, it defies easy explication. In these cases, we consider the constitutionality of two attempts to define "reasonable doubt."

I

The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Cf. *Hopt* v. *Utah*, 120 U. S. 430, 440–441 (1887). Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, see *Jackson* v. *Virginia*, 443 U. S. 307, 320, n. 14 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Cf. *Taylor* v. *Kentucky*, 436 U. S. 478, 485–486 (1978). Rather, "taken as a whole, the instructions [must] correctly convey[y] the concept of reasonable doubt to the jury." *Holland* v. *United States*, 348 U. S. 121, 140 (1954).

In only one case have we held that a definition of reasonable doubt violated the Due Process Clause. *Cage* v. *Louisiana*, 498 U. S. 39 (1990) *(per curiam)*. There, the jurors were told:

> " '[A reasonable doubt] is one. that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible

---

*JUSTICES BLACKMUN and SOUTER join only Part II of this opinion. JUSTICE GINSBURG joins only Parts II, III–B, and IV.

doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*'" *Id.,* at 40 (emphasis added by this Court in *Cage*).

We held that the highlighted portions of the instruction rendered it unconstitutional:

"It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Id.,* at 41.

In a subsequent case, we made clear that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it. *Estelle* v. *McGuire,* 502 U. S. 62, 72, and n. 4 (1991). The constitutional question in the present cases, therefore, is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard. Although other courts have held that instructions similar to those given at petitioners' trials violate the Due Process Clause, see *State* v. *Bryant,* 334 N. C. 333, 432 S. E. 2d 291 (1993), cert. pending, No. 93–753; *Morley* v. *Stenberg,* 828 F. Supp. 1413 (Neb. 1993), both the Nebraska and the California Supreme Courts held that the instructions were constitutional. We granted certiorari, 509 U. S. 954 (1993), and now affirm both judgments.

## II

On October 14, 1984, petitioner Sandoval shot three men, two of them fatally, in a gang-related incident in Los Angeles. About two weeks later, he entered the home of a man who had given information to the police about the murders and shot him dead; Sandoval then killed the man's wife because she had seen him murder her husband. Sandoval was convicted on four counts of first degree murder. The jury found that Sandoval personally used a firearm in the commission of each offense, and found the special circumstance of multiple murder. Cal. Penal Code Ann. § 12022.5 (West 1992) and Cal. Penal Code Ann. § 190.2(a)(3) (West 1988). He was sentenced to death for murdering the woman and to life in prison without possibility of parole for the other three murders. The California Supreme Court affirmed the convictions and sentences. 4 Cal. 4th 155, 841 P. 2d 862 (1992).

The jury in Sandoval's case was given the following instruction on the government's burden of proof:

> "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt.
>
> "Reasonable doubt is defined as follows: It is *not a mere possible doubt;* because everything relating to human affairs, and *depending on moral evidence,* is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, *to a moral certainty,* of the truth of the charge." App. in No. 92–9049, p. 49 (emphasis added) (Sandoval App.).

8

The California Supreme Court rejected Sandoval's claim that the instruction, particularly the highlighted passages, violated the Due Process Clause. 4 Cal. 4th, at 185–186, 841 P. 2d, at 878.

The instruction given in Sandoval's case has its genesis in a charge given by Chief Justice Shaw of the Massachusetts Supreme Judicial Court more than a century ago:

> "[W]hat is reasonable doubt? It is a term often used, probably pretty well understood, but not easily defined. It is not mere possible doubt; because every thing relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge. The burden of proof is upon the prosecutor. All the presumptions of law independent of evidence are in favor of innocence; and every person is presumed to be innocent until he is proved guilty. If upon such proof there is reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal. For it is not sufficient to establish a probability, though a strong one arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary; but the evidence must establish the truth of the fact to a reasonable and moral certainty; a certainty that convinces and directs the understanding, and satisfies the reason and judgment, of those who are bound to act conscientiously upon it. This we take to be proof beyond reasonable doubt." *Commonwealth* v. *Webster*, 59 Mass. 295, 320 (1850).

The *Webster* charge is representative of the time when "American courts began applying [the beyond a reasonable doubt standard] in its modern form in criminal cases." *Apo-*

*daca* v. *Oregon,* 406 U. S. 404, 412, n. 6 (1972) (plurality opinion). See also *Perovich* v. *United States,* 205 U. S. 86, 92 (1907) (approving *Webster* charge). In *People* v. *Strong,* 30 Cal. 151, 155 (1866), the California Supreme Court characterized the *Webster* instruction as "probably the most satisfactory definition ever given to the words 'reasonable doubt' in any case known to criminal jurisprudence." In *People* v. *Paulsell,* 115 Cal. 6, 12, 46 P. 734 (1896), the court cautioned state trial judges against departing from that formulation. And in 1927, the state legislature adopted the bulk of the *Webster* instruction as a statutory definition of reasonable doubt. Cal. Penal Code Ann. § 1096 (West 1985); see California Jury Instructions, Criminal, No. 2.90 (4th ed. 1979). Indeed, the California Legislature has directed that "the court may read to the jury section 1096 of this code, and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given." § 1096a. The statutory instruction was given in Sandoval's case.

The California instruction was criticized in *People* v. *Brigham,* 25 Cal. 3d 283, 292–316, 599 P. 2d 100, 106–121 (1979) (Mosk, J., concurring). Justice Mosk apparently did not think the instruction was unconstitutional, but he "urge[d] the Legislature to reconsider its codification." *Id.,* at 293, 599 P. 2d, at 106. The California Assembly and Senate responded by requesting the committee on jury instructions of the Los Angeles Superior Court "to study alternatives to the definition of 'reasonable doubt' set forth in Section 1096 of the Penal Code, and to report its findings and recommendations to the Legislature." Cal. Assem. Con. Res. No. 148, 1986 Cal. Stats. 5634. The committee recommended that the legislature retain the statutory definition unmodified, see Alternative Definitions of Reasonable Doubt: A Report of the Committee on Standard Jury Instructions—Criminal to the California Legislature (May 22, 1987), and § 1096 has not been changed.

## A

Sandoval's primary objection is to the use of the phrases "moral evidence" and "moral certainty" in the instruction. As noted, this part of the charge was lifted verbatim from Chief Justice Shaw's *Webster* decision; some understanding of the historical context in which that instruction was written is accordingly helpful in evaluating its continuing validity.

By the beginning of the Republic, lawyers had borrowed the concept of "moral evidence" from the philosophers and historians of the 17th and 18th centuries. See generally B. Shapiro, "Beyond Reasonable Doubt" and "Probable Cause": Historical Perspectives on the Anglo-American Law of Evidence, ch. 1 (1991). James Wilson, who was instrumental in framing the Constitution and who served as one of the original Members of this Court, explained in a 1790 lecture on law that "evidence . . . is divided into two species—demonstrative and moral." 1 Works of James Wilson 518 (J. Andrews ed. 1896). Wilson went on to explain the distinction thus:

> "Demonstrative evidence has for its subject abstract and necessary truths, or the unchangeable relations of ideas. Moral evidence has for its subject the real but contingent truths and connections, which take place among things actually existing. . . .
>
> .      .      .      .      .
>
> "In moral evidence, there not only may be, but there generally is, contrariety of proofs: in demonstrative evidence, no such contrariety can take place. . . . [T]o suppose that two contrary demonstrations can exist, is to suppose that the same proposition is both true and false: which is manifestly absurd. With regard to moral evidence, there is, for the most part, real evidence on both sides. On both sides, contrary presumptions, contrary

testimonies, contrary experiences must be balanced."
*Id.*, at 518–519.

A leading 19th century treatise observed that "[m]atters of fact are proved by *moral evidence* alone; . . . [i]n the ordinary affairs of life, we do not require demonstrative evidence, . . . and to insist upon it would be unreasonable and absurd." 1 S. Greenleaf, Law of Evidence 3–4 (13th ed. 1876).

The phrase "moral certainty" shares an epistemological pedigree with moral evidence. See generally Shapiro, "To A Moral Certainty": Theories of Knowledge and Anglo-American Juries 1600–1850, 38 Hastings L. J. 153 (1986). Moral certainty was the highest degree of certitude based on such evidence. In his 1790 lecture, James Wilson observed:

> "In a series of moral evidence, the inference drawn in the several steps is not necessary; nor is it impossible that the premises should be true, while the conclusion drawn from them is false.
>
> ". . . In moral evidence, we rise, by an insensible gradation, from possibility to probability, and from probability to the highest degree of moral certainty." 1 Works of James Wilson, *supra*, at 519.

At least one early treatise explicitly equated moral certainty with proof beyond a reasonable doubt:

> "Evidence which satisfies the minds of the jury of the truth of the fact in dispute, to the entire exclusion of every reasonable doubt, constitutes full proof of the fact. . . .
>
> "Even the most direct evidence can produce nothing more than such a high degree of probability as amounts to moral certainty. From the highest degree it may decline, by an infinite number of gradations, until it produce in the mind nothing more than a mere preponderance of assent in favour of the particular fact." T. Starkie, Law of Evidence 478 (2d ed. 1833).

See also Greenleaf, *supra*, at 4 ("The most that can be affirmed of [things proved by moral evidence] is, that there is no reasonable doubt concerning them").

Thus, when Chief Justice Shaw penned the *Webster* instruction in 1850, moral certainty meant a state of subjective certitude about some event or occurrence. As the Massachusetts Supreme Judicial Court subsequently explained:

> "Proof 'beyond a reasonable doubt' . . . is proof 'to a moral certainty,' as distinguished from an absolute certainty. As applied to a judicial trial for crime, the two phrases are synonymous and equivalent; each has been used by eminent judges to explain the other; and each signifies such proof as satisfies the judgment and consciences of the jury, as reasonable men, and applying their reason to the evidence before them, that the crime charged has been committed by the defendant, and so satisfies them as to leave no other reasonable conclusion possible." *Commonwealth* v. *Costley*, 118 Mass. 1, 24 (1875).

Indeed, we have said that "[p]roof to a 'moral certainty' is an equivalent phrase with 'beyond a reasonable doubt.'" *Fidelity Mut. Life Assn.* v. *Mettler*, 185 U. S. 308, 317 (1902), citing *Commonwealth* v. *Costley, supra.* See also *Wilson* v. *United States*, 232 U. S. 563, 570 (1914) (approving reasonable doubt instruction cast in terms of moral certainty); *Miles* v. *United States*, 103 U. S. 304, 309, 312 (1881).

We recognize that the phrase "moral evidence" is not a mainstay of the modern lexicon, though we do not think it means anything different today than it did in the 19th century. The few contemporary dictionaries that define moral evidence do so consistently with its original meaning. See, *e. g.*, Webster's New Twentieth Century Dictionary 1168 (2d ed. 1979) ("based on general observation of people, etc. rather than on what is demonstrable"); Collins English Dic-

tionary 1014 (3d ed. 1991) (similar); 9 Oxford English Diction-
ary 1070 (2d ed. 1989) (similar).

Moreover, the instruction itself gives a definition of the
phrase. The jury was told that "everything relating to
human affairs, and depending on moral evidence, is open to
some possible or imaginary doubt"—in other words, that ab-
solute certainty is unattainable in matters relating to human
affairs. Moral evidence, in this sentence, can only mean em-
pirical evidence offered to prove such matters—the proof in-
troduced at trial.

This conclusion is reinforced by other instructions given
in Sandoval's case. The judge informed the jurors that their
duty was "to determine the facts of the case from the evi-
dence received in the trial and not from any other source."
Sandoval App. 38. The judge continued: "Evidence consists
of testimony of witnesses, writings, material objects, or any-
thing presented to the senses and offered to prove the exist-
ence or non-existence of a fact." *Id.*, at 40. The judge also
told the jurors that "you must not be influenced by pity for
a defendant or by prejudice against him," and that "[y]ou
must not be swayed by mere sentiment, conjecture, sympa-
thy, passion, prejudice, public opinion or public feeling."
*Id.*, at 39. These instructions correctly pointed the jurors'
attention to the facts of the case before them, not (as Sando-
val contends) the ethics or morality of Sandoval's criminal
acts. Accordingly, we find the reference to moral evidence
unproblematic.

We are somewhat more concerned with Sandoval's argu-
ment that the phrase "moral certainty" has lost its historical
meaning, and that a modern jury would understand it to
allow conviction on proof that does not meet the beyond a
reasonable doubt standard. Words and phrases can change
meaning over time: A passage generally understood in 1850
may be incomprehensible or confusing to a modern juror.
And although some contemporary dictionaries contain defi-
nitions of moral certainty similar to the 19th century under-

standing of the phrase, see Webster's Third New International Dictionary 1468 (1981) ("virtual rather than actual, immediate, or completely demonstrable"); 9 Oxford English Dictionary, *supra*, at 1070 ("a degree of probability so great as to admit of no reasonable doubt"), we are willing to accept Sandoval's premise that "moral certainty," standing alone, might not be recognized by modern jurors as a synonym for "proof beyond a reasonable doubt." But it does not necessarily follow that the California instruction is unconstitutional.

Sandoval first argues that moral certainty would be understood by modern jurors to mean a standard of proof lower than beyond a reasonable doubt. In support of this proposition, Sandoval points to contemporary dictionaries that define moral certainty in terms of probability. *E. g.*, Webster's New Twentieth Century Dictionary, *supra*, at 1168 ("based on strong probability"); Random House Dictionary of the English Language 1249 (2d ed. 1983) ("resting upon convincing grounds of probability"). But the beyond a reasonable doubt standard is itself probabilistic. "[I]n a judicial proceeding in which there is a dispute about the facts of some earlier event, the factfinder cannot acquire unassailably accurate knowledge of what happened. Instead, all the factfinder can acquire is a belief of what *probably* happened." *In re Winship*, 397 U. S., at 370 (Harlan, J., concurring) (emphasis in original). The problem is not that moral certainty may be understood in terms of probability, but that a jury might understand the phrase to mean something less than the very high level of probability required by the Constitution in criminal cases.

Although in this respect moral certainty is ambiguous in the abstract, the rest of the instruction given in Sandoval's case lends content to the phrase. The jurors were told that they must have "an abiding conviction, to a moral certainty, of the truth of the charge." Sandoval App. 49. An instruction cast in terms of an abiding conviction as to guilt, without

reference to moral certainty, correctly states the government's burden of proof. *Hopt* v. *Utah*, 120 U. S., at 439 ("The word 'abiding' here has the signification of settled and fixed, a conviction which may follow a careful examination and comparison of the whole evidence"); see Criminal Jury Instructions: District of Columbia 46 (3d H. Greene & T. Guidoboni ed. 1978). And the judge had already informed the jury that matters relating to human affairs are proved by moral evidence, see *supra*, at 13; giving the same meaning to the word moral in this part of the instruction, moral certainty can only mean certainty with respect to human affairs. As used in this instruction, therefore, we are satisfied that the reference to moral certainty, in conjunction with the abiding conviction language, "impress[ed] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused." *Jackson* v. *Virginia*, 443 U. S., at 315. Accordingly, we reject Sandoval's contention that the moral certainty element of the California instruction invited the jury to convict him on proof below that required by the Due Process Clause.

Sandoval's second argument is a variant of the first. Accepting that the instruction requires a high level of confidence in the defendant's guilt, Sandoval argues that a juror might be convinced to a moral certainty that the defendant is guilty even though the government has failed to *prove* his guilt beyond a reasonable doubt. A definition of moral certainty in a widely used modern dictionary lends support to this argument, see American Heritage Dictionary 1173 (3d ed. 1992) ("Based on strong likelihood or firm conviction, rather than on the actual evidence"), and we do not gainsay its force. As we have noted, "[t]he constitutional standard recognized in the *Winship* case was expressly phrased as one that protects an accused against a conviction except on '*proof* beyond a reasonable doubt.'" *Jackson* v. *Virginia, supra,* at 315 (emphasis in original). Indeed, in *Cage* we contrasted

"moral certainty" with "evidentiary certainty." 498 U. S., at 41.

But the moral certainty language cannot be sequestered from its surroundings. In the *Cage* instruction, the jurors were simply told that they had to be morally certain of the defendant's guilt; there was nothing else in the instruction to lend meaning to the phrase. Not so here. The jury in Sandoval's case was told that a reasonable doubt is "that state of the case which, *after the entire comparison and consideration of all the evidence,* leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." Sandoval App. 49 (emphasis added). The instruction thus explicitly told the jurors that their conclusion had to be based on the evidence in the case. Other instructions reinforced this message. The jury was told "to determine the facts of the case from the evidence received in the trial and not from any other source." *Id.,* at 38. The judge continued that "you must not be influenced by pity for a defendant or by prejudice against him. . . . You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." *Id.,* at 39. Accordingly, there is no reasonable likelihood that the jury would have understood moral certainty to be disassociated from the evidence in the case.

We do not think it reasonably likely that the jury understood the words "moral certainty" either as suggesting a standard of proof lower than due process requires or as allowing conviction on factors other than the government's proof. At the same time, however, we do not condone the use of the phrase. As modern dictionary definitions of moral certainty attest, the common meaning of the phrase has changed since it was used in the *Webster* instruction, and it may continue to do so to the point that it conflicts with the *Winship* standard. Indeed, the definitions of reasonable doubt most widely used in the federal courts do not contain

any reference to moral certainty. See Federal Judicial Center, Pattern Criminal Jury Instructions 28 (1988); 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 11.14 (3d ed. 1977). But we have no supervisory power over the state courts, and in the context of the instructions as a whole we cannot say that the use of the phrase rendered the instruction given in Sandoval's case unconstitutional.

## B

Finally, Sandoval objects to the portion of the charge in which the judge instructed the jury that a reasonable doubt is "not a mere possible doubt." The *Cage* instruction included an almost identical reference to "not a mere possible doubt," but we did not intimate that there was anything wrong with that part of the charge. See 498 U. S., at 40. That is because "[a] 'reasonable doubt,' at a minimum, is one based upon 'reason.'" *Jackson* v. *Virginia, supra,* at 317. A fanciful doubt is not a reasonable doubt. As Sandoval's defense attorney told the jury: "Anything can be possible . . . . [A] planet could be made out of blue cheese. But that's really not in the realm of what we're talking about." Sandoval App. 79 (excerpt from closing argument). That this is the sense in which the instruction uses "possible" is made clear from the final phrase of the sentence, which notes that everything "is open to some possible or imaginary doubt." We therefore reject Sandoval's challenge to this portion of the instruction as well.

## III

On December 26, 1987, petitioner Victor went to the Omaha home of an 82-year-old woman for whom he occasionally did gardening work. Once inside, he beat her with a pipe and cut her throat with a knife, killing her. Victor was convicted of first degree murder. A three-judge panel found the statutory aggravating circumstances that Victor had previously been convicted of murder, Neb. Rev. Stat. § 29–2523(1)(a) (1989), and that the murder in this case was espe-

cially heinous, atrocious, and cruel, § 29–2523(1)(d). Finding none of the statutory mitigating circumstances, the panel sentenced Victor to death. The Nebraska Supreme Court affirmed the conviction and sentence. *State* v. *Victor*, 235 Neb. 770, 457 N. W. 2d 431 (1990), cert. denied, 498 U. S. 1127 (1991).

At Victor's trial, the judge instructed the jury that "[t]he burden is always on the State to prove beyond a reasonable doubt all of the material elements of the crime charged, and this burden never shifts." App. in No. 92–8894, p. 8 (Victor App.). The charge continued:

> " 'Reasonable doubt' is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, *to a moral certainty,* of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the *strong probabilities of the case,* provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an *actual and substantial doubt* reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." *Id.,* at 11 (emphasis added).

On state postconviction review, the Nebraska Supreme Court rejected Victor's contention that the instruction, par-

ticularly the emphasized phrases, violated the Due Process Clause. 242 Neb. 306, 310–311, 494 N. W. 2d 565, 569 (1993). Because the last state court in which review could be had considered Victor's constitutional claim on the merits, it is properly presented for our review despite Victor's failure to object to the instruction at trial or raise the issue on direct appeal. See, e. g., *Ylst* v. *Nunnemaker*, 501 U. S. 797, 801 (1991).

The instruction given in Victor's case can be traced to two separate lines of cases. Much of the charge is taken from Chief Justice Shaw's *Webster* instruction. See *Carr* v. *State*, 23 Neb. 749, 752–753, 37 N. W. 630, 631–632 (1888) (approving the use of *Webster*). The rest derives from a series of decisions approving instructions cast in terms of an "actual doubt" that would cause a reasonable person to hesitate to act. See, e. g., *Whitney* v. *State*, 53 Neb. 287, 298, 73 N. W. 696, 699 (1898); *Willis* v. *State*, 43 Neb. 102, 110–111, 61 N. W. 254, 256 (1894); *Polin* v. *State*, 14 Neb. 540, 546–547, 16 N. W. 898, 900–901 (1883). In 1968, a committee appointed by the Nebraska Supreme Court developed model jury instructions; a court rule in effect at the time Victor was tried directed that those instructions were to be used where applicable. Nebraska Jury Instructions IX (1969) (N. J. I.). The model instruction on reasonable doubt, N. J. I. 14.08, is the one given at Victor's trial. (Since Victor was tried, a revised reasonable doubt instruction, N. J. I. 2d Crim. 2.0 (1992), has been adopted, although the prior version may still be used.)

A

Victor's primary argument is that equating a reasonable doubt with a "substantial doubt" overstated the degree of doubt necessary for acquittal. We agree that this construction is somewhat problematic. On the one hand, "substantial" means "not seeming or imaginary"; on the other, it means "that specified to a large degree." Webster's Third New International Dictionary, at 2280. The former is un-

exceptionable, as it informs the jury only that a reasonable doubt is something more than a speculative one; but the latter could imply a doubt greater than required for acquittal under *Winship*. Any ambiguity, however, is removed by reading the phrase in the context of the sentence in which it appears: "A reasonable doubt is an actual and substantial doubt . . . *as distinguished from* a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." Victor App. 11 (emphasis added).

This explicit distinction between a substantial doubt and a fanciful conjecture was not present in the *Cage* instruction. We did say in that case that "the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." 498 U. S., at 41. But we did not hold that the reference to substantial doubt alone was sufficient to render the instruction unconstitutional. Cf. *Taylor* v. *Kentucky*, 436 U. S., at 488 (defining reasonable doubt as a substantial doubt, "though perhaps *not in itself reversible error*, often has been criticized as confusing") (emphasis added). Rather, we were concerned that the jury would interpret the term "substantial doubt" in parallel with the preceding reference to "grave uncertainty," leading to an overstatement of the doubt necessary to acquit. In the instruction given in Victor's case, the context makes clear that "substantial" is used in the sense of existence rather than magnitude of the doubt, so the same concern is not present.

In any event, the instruction provided an alternative definition of reasonable doubt: a doubt that would cause a reasonable person to hesitate to act. This is a formulation we have repeatedly approved, *Holland* v. *United States*, 348 U. S., at 140; cf. *Hopt* v. *Utah*, 120 U. S., at 439–441, and to the extent the word "substantial" denotes the quantum of doubt necessary for acquittal, the hesitate to act standard gives a commonsense benchmark for just how substantial

such a doubt must be. We therefore do not think it reasonably likely that the jury would have interpreted this instruction to indicate that the doubt must be anything other than a reasonable one.

B

Victor also challenges the "moral certainty" portion of the instruction. In another case involving an identical instruction, the Nebraska Supreme Court distinguished *Cage* as follows: "[U]nder the *Cage* instruction a juror is to vote for conviction unless convinced to a moral certainty that there exists a reasonable doubt, whereas under the questioned instruction a juror is to vote for acquittal unless convinced to a moral certainty that no reasonable doubt exists." *State* v. *Morley*, 239 Neb. 141, 155, 474 N. W. 2d 660, 670 (1991); see also 242 Neb., at 310–311, 494 N. W. 2d, at 569 (relying on *Morley*). We disagree with this reading of *Cage*. The moral certainty to which the *Cage* instruction referred was clearly related to the defendant's guilt; the problem in *Cage* was that the rest of the instruction provided insufficient context to lend meaning to the phrase. But the Nebraska instruction is not similarly deficient.

Instructing the jurors that they must have an abiding conviction of the defendant's guilt does much to alleviate any concerns that the phrase "moral certainty" might be misunderstood in the abstract. See *supra,* at 14–15. The instruction also equated a doubt sufficient to preclude moral certainty with a doubt that would cause a reasonable person to hesitate to act. In other words, a juror morally certain of a fact would not hesitate to rely on it; and such a fact can fairly be said to have been proved beyond a reasonable doubt. Cf. *Hopt* v. *Utah, supra,* at 439–440. The jurors were told that they must be convinced of Victor's guilt "after full, fair, and impartial consideration of all the evidence." Victor App. 11. The judge also told them: "In determining any questions of fact presented in this case, you should be governed solely by the evidence introduced before you. You should not indulge

in speculation, conjectures, or inferences not supported by the evidence." *Id.*, at 2. There is accordingly no reasonable likelihood that the jurors understood the reference to moral certainty to allow conviction on a standard insufficient to satisy *Winship*, or to allow conviction on factors other than the government's proof. Though we reiterate that we do not countenance its use, the inclusion of the "moral certainty" phrase did not render the instruction given in Victor's case unconstitutional.

## C

Finally, Victor argues that the reference to "strong probabilities" in the instruction unconstitutionally understated the government's burden. But in the same sentence, the instruction informs the jury that the probabilities must be strong enough to prove the defendant's guilt beyond a reasonable doubt. We upheld a nearly identical instruction in *Dunbar* v. *United States*, 156 U. S. 185, 199 (1895): "While it is true that [the challenged instruction] used the words 'probabilities' and 'strong probabilities,' yet it emphasized the fact that those probabilities must be so strong as to exclude any reasonable doubt, and that is unquestionably the law" (citing *Hopt* v. *Utah, supra*, at 439). That conclusion has lost no force in the course of a century, and we therefore consider *Dunbar* controlling on this point.

## IV

The Due Process Clause requires the government to prove a criminal defendant's guilt beyond a reasonable doubt, and trial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires. In these cases, however, we conclude that "taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury." *Holland* v. *United States, supra*, at 140. There is no reasonable likelihood that the jurors who determined petitioners' guilt applied the instruc-

tions in a way that violated the Constitution. The judgments in both cases are accordingly

*Affirmed.*

JUSTICE KENNEDY, concurring.

It was commendable for Chief Justice Shaw to pen an instruction that survived more than a century, but, as the Court makes clear, what once might have made sense to jurors has long since become archaic. In fact, some of the phrases here in question confuse far more than they clarify.

Though the reference to "moral certainty" is not much better, California's use of "moral evidence" is the most troubling, and to me seems quite indefensible. The derivation of the phrase is explained in the Court's opinion, but even with this help the term is a puzzle. And for jurors who have not had the benefit of the Court's research, the words will do nothing but baffle.

I agree that use of "moral evidence" in the California formulation is not fatal to the instruction here. I cannot understand, however, why such an unruly term should be used at all when jurors are asked to perform a task that can be of great difficulty even when instructions are altogether clear. The inclusion of words so malleable, because so obscure, might in other circumstances have put the whole instruction at risk.

With this observation, I concur in full in the opinion of the Court.

JUSTICE GINSBURG, concurring in part and concurring in the judgment.

I agree with the Court that the reasonable doubt instructions given in these cases, read as a whole, satisfy the Constitution's due process requirement. As the Court observes, the instructions adequately conveyed to the jurors that they should focus exclusively upon the evidence, see *ante*, at 13, 16, 21–22, and that they should convict only if they had an

"abiding conviction" of the defendant's guilt, see *ante*, at 14, 21. I agree, further, with the Court's suggestion that the term "moral certainty," while not in itself so misleading as to render the instructions unconstitutional, should be avoided as an unhelpful way of explaining what reasonable doubt means. See *ante*, at 16, 22.

Similarly unhelpful, in my view, are two other features of the instruction given in Victor's case. That instruction begins by defining reasonable doubt as "such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon." App. in No. 92–8894, p. 11. A committee of distinguished federal judges, reporting to the Judicial Conference of the United States, has criticized this "hesitate to act" formulation

> "because the analogy it uses seems misplaced. In the decisions people make in the most important of their own affairs, resolution of conflicts about past events does not usually play a major role. Indeed, decisions we make in the most important affairs of our lives—choosing a spouse, a job, a place to live, and the like—generally involve a very heavy element of uncertainty and risk-taking. They are wholly unlike the decisions jurors ought to make in criminal cases." Federal Judicial Center, Pattern Criminal Jury Instructions 18–19 (1987) (commentary on instruction 21).

More recently, Second Circuit Chief Judge Jon O. Newman observed:

> "Although, as a district judge, I dutifully repeated [the 'hesitate to act' standard] to juries in scores of criminal trials, I was always bemused by its ambiguity. If the jurors encounter a doubt that would cause them to 'hesitate to act in a matter of importance,' what are they to do then? Should they decline to convict because they

have reached a point of hesitation, or should they simply hesitate, then ask themselves whether, in their own private matters, they would resolve the doubt in favor of action, and, if so, continue on to convict?" Beyond "Reasonable Doubt," 68 N. Y. U. L. Rev. 201, 204 (1994) (James Madison Lecture, delivered at New York University Law School, Nov. 9, 1993).

Even less enlightening than the "hesitate to act" formulation is the passage of the *Victor* instruction counseling: "[The jury] may find an accused guilty upon the strong probabilities of the case, *provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable.*" App. in No. 92–8894, p. 11. If the italicized words save this part of the instruction from understating the prosecution's burden of proof, see *ante,* at 22, they do so with uninstructive circularity. Jury comprehension is scarcely advanced when a court "defines" reasonable doubt as "doubt . . . that is reasonable."

These and similar difficulties have led some courts to question the efficacy of any reasonable doubt instruction. At least two of the Federal Courts of Appeals have admonished their District Judges not to attempt a definition.* This Court, too, has suggested on occasion that prevailing definitions of "reasonable doubt" afford no real aid. See, *e. g., Holland* v. *United States,* 348 U. S. 121, 140 (1954) ("'[a]ttempts to explain the term "reasonable doubt" do not usually result in making it any clearer to the minds of the jury'"),

---

*See, *e. g., United States* v. *Adkins,* 937 F. 2d 947, 950 (CA4 1991) ("This circuit has repeatedly warned against giving the jury definitions of reasonable doubt, because definitions tend to impermissibly lessen the burden of proof. . . . The only exception to our categorical disdain for definition is when the jury specifically requests it."); *United States* v. *Hall,* 854 F. 2d 1036, 1039 (CA7 1988) (upholding District Court's refusal to provide definition, despite jury's request, because "at best, definitions of reasonable doubt are unhelpful to a jury . . . . An attempt to define reasonable doubt presents a risk without any real benefit.").

quoting *Miles* v. *United States,* 103 U. S. 304, 312 (1881); *Hopt* v. *Utah,* 120 U. S. 430, 440–441 (1887) ("The rule may be, and often is, rendered obscure by attempts at definition, which serve to create doubts instead of removing them."). But we have never held that the concept of reasonable doubt is undefinable, or that trial courts should not, as a matter of course, provide a definition. Nor, contrary to the Court's suggestion, see *ante,* at 5, have we ever held that the Constitution does not require trial courts to define reasonable doubt.

Because the trial judges in fact defined reasonable doubt in both jury charges we review, we need not decide whether the Constitution required them to do so. Whether or not the Constitution so requires, however, the argument for defining the concept is strong. While judges and lawyers are familiar with the reasonable doubt standard, the words "beyond a reasonable doubt" are not self-defining for jurors. Several studies of jury behavior have concluded that "jurors are often confused about the meaning of reasonable doubt" when that term is left undefined. See Note, Defining Reasonable Doubt, 90 Colum. L. Rev. 1716, 1723 (1990) (citing studies). Thus, even if definitions of reasonable doubt are necessarily imperfect, the alternative—refusing to define the concept at all—is not obviously preferable. Cf. Newman, *supra,* at 205–206 ("I find it rather unsettling that we are using a formulation that we believe will become less clear the more we explain it.").

Fortunately, the choice need not be one between two kinds of potential juror confusion—on one hand, the confusion that may be caused by leaving "reasonable doubt" undefined, and on the other, the confusion that might be induced by the anachronism of "moral certainty," the misplaced analogy of "hesitation to act," or the circularity of "doubt that is reasonable." The Federal Judicial Center has proposed a definition of reasonable doubt that is clear, straightforward, and accurate. That instruction reads:

"[T]he government has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

"Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty." Federal Judicial Center, Pattern Criminal Jury Instructions, at 17–18 (instruction 21).

This instruction plainly informs the jurors that the prosecution must prove its case by more than a mere preponderance of the evidence, yet not necessarily to an absolute certainty. The "firmly convinced" standard for conviction, repeated for emphasis, is further enhanced by the juxtaposed prescription that the jury must acquit if there is a "real possibility" that the defendant is innocent. This model instruction surpasses others I have seen in stating the reasonable doubt standard succinctly and comprehensibly.

I recognize, however, that this Court has no supervisory powers over the state courts, see *ante*, at 17, and that the test we properly apply in evaluating the constitutionality of a reasonable doubt instruction is not whether we find it exemplary; instead, we inquire only whether there is a "reasonable likelihood that the jury understood the instructio[n] to allow conviction based on proof insufficient to meet" the rea-

sonable doubt standard. See *ante*, at 6. On that understanding, I join Parts II, III–B, and IV of the Court's opinion and concur in its judgment.

JUSTICE BLACKMUN, with whom JUSTICE SOUTER joins in all but Part II, concurring in part and dissenting in part.

In *Cage* v. *Louisiana*, 498 U. S. 39 (1990), this Court, by a *per curiam* opinion, found a jury instruction defining reasonable doubt so obviously flawed that the resulting state-court judgment deserved summary reversal. The majority today purports to uphold and follow *Cage*, but plainly falters in its application of that case. There is no meaningful difference between the jury instruction delivered at Victor's trial and the jury instruction issued in *Cage*, save the fact that the jury instruction in Victor's case did not contain the two words "grave uncertainty." But the mere absence of these two words can be of no help to the State, since there is other language in the instruction that is equally offensive to due process. I therefore dissent from the Court's opinion and judgment in No. 92–8894, *Victor* v. *Nebraska*.

I

Our democracy rests in no small part on our faith in the ability of the criminal justice system to separate those who are guilty from those who are not. This is a faith which springs fundamentally from the requirement that unless guilt is established beyond all reasonable doubt, the accused shall go free. It was not until 1970, however, in *In re Winship*, 397 U. S. 358, that the Court finally and explicitly held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.*, at 364. In *Winship*, the Court recounted the long history of the reasonable-doubt standard, noting that it "dates at least from our early years as a Na-

tion." *Id.*, at 361. The Court explained that any "society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is a reasonable doubt about his guilt." *Id.*, at 363–364.

Despite the inherent appeal of the reasonable-doubt standard, it provides protection to the innocent only to the extent that the standard, in reality, is an enforceable rule of law. To be a meaningful safeguard, the reasonable-doubt standard must have a tangible meaning that is capable of being understood by those who are required to apply it. It must be stated accurately and with the precision owed to those whose liberty or life is at risk. Because of the extraordinarily high stakes in criminal trials, "[i]t is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.*, at 364.

When reviewing a jury instruction that defines "reasonable doubt," it is necessary to consider the instruction as a whole and to give the words their common and ordinary meaning. *Estelle* v. *McGuire*, 502 U. S. 62, 72 (1991). It is not sufficient for the jury instruction merely to be susceptible to an interpretation that is technically correct. The important question is whether there is a "reasonable likelihood" that the jury was misled or confused by the instruction, and therefore applied it in a way that violated the Constitution. *Boyde* v. *California*, 494 U. S. 370, 380 (1990). Any jury instruction defining "reasonable doubt" that suggests an improperly high degree of doubt for acquittal or an improperly low degree of certainty for conviction offends due process. Either misstatement of the reasonable-doubt standard is prejudicial to the defendant, as it "vitiates all the jury's findings," see *Sullivan* v. *Louisiana*, 508 U. S. 275, 281 (1993) (emphasis deleted), and removes the only constitutionally appropriate predicate for the jury's verdict.

## A

In a Louisiana trial court, Tommy Cage was convicted of first-degree murder and sentenced to death. On appeal to the Supreme Court of Louisiana, he argued, among other things, that the reasonable-doubt instruction used in the guilt phase of his trial violated the Due Process Clause of the Fourteenth Amendment. See *State* v. *Cage*, 554 So. 2d 39 (1989). The instruction in relevant part provided:

> "If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such a doubt as would give rise to a *grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an *actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*" *Id.,* at 41 (second emphasis added; first and third emphases in original).

The Louisiana Supreme Court affirmed Cage's conviction, reasoning that, although some of the language "might overstate the requisite degree of uncertainty and confuse the jury," the charge as a whole was understandable to "reasonable persons of ordinary intelligence," and therefore constitutional. *Ibid.*

We granted certiorari and summarily reversed. *Cage* v. *Louisiana,* 498 U. S. 39 (1990). The Court noted that some of the language in the instruction was adequate, but ruled

that the phrases "actual substantial doubt" and "grave un-
certainty" suggested a "higher degree of doubt than is re-
quired for acquittal under the reasonable-doubt standard,"
and that those phrases taken together with the reference to
"moral certainty," rather than "evidentiary certainty," ren-
dered the instruction as a whole constitutionally defective.
*Id.*, at 41.

Clarence Victor, petitioner in No. 92–8894, also was con-
victed of first-degree murder and sentenced to death. The
instruction in his case reads as follows:

> " 'Reasonable doubt' is such a doubt as would cause a
> reasonable and prudent person, in one of the graver and
> more important transactions of life, to pause and hesi-
> tate before taking the represented facts as true and re-
> lying and acting thereon. It is such a doubt as will not
> permit you, after full, fair, and impartial consideration
> of all the evidence, to have an abiding conviction, to a
> *moral certainty*, of the guilt of the accused. At the
> same time absolute or mathematical certainty is not re-
> quired. *You may be convinced of the truth of a fact
> beyond a reasonable doubt and yet be fully aware that
> possibly you may be mistaken. You may find an ac-
> cused guilty upon the strong probabilities of the case*,
> provided such probabilities are strong enough to exclude
> any doubt of his guilt that is reasonable. A reasonable
> doubt is an *actual and substantial doubt* reasonably
> arising from the evidence, from the facts or circum-
> stances shown by the evidence, or from the lack of evi-
> dence on the part of the State, as distinguished from a
> doubt arising from mere possibility, from bare imagina-
> tion, or from fanciful conjecture." App. in No. 92–8894,
> p. 11 (emphases added).

The majority's attempt to distinguish this instruction from
the one employed in *Cage* is wholly unpersuasive. Both in-
structions equate "substantial doubt" with reasonable doubt,

and refer to "moral certainty" rather than "evidentiary certainty." And although Victor's instruction does not contain the phrase "grave uncertainty," the instruction contains language that has an equal potential to mislead, including the invitation to the jury to convict based on the "strong probabilities" of the case and the overt effort to dissuade jurors from acquitting when they are "fully aware that possibly they may be mistaken." Nonetheless, the majority argues that "substantial doubt" has a meaning in Victor's instruction different from that in Cage's instruction, and that the "moral certainty" language is sanitized by its context. The majority's approach seems to me to fail under its own logic.

## B

First, the majority concedes, as it must, that equating reasonable doubt with substantial doubt is "somewhat problematic" since one of the common definitions of "substantial" is "'that specified to a large degree.'" *Ante,* at 19. But the majority insists that the jury did not likely interpret the word "substantial" in this manner because Victor's instruction, unlike Cage's instruction, used the phrase "substantial doubt" as a means of distinguishing reasonable doubt from mere conjecture. According to the majority, "[t]his explicit distinction between a substantial doubt and a fanciful conjecture was not present in the *Cage* instruction," and thus, read in context, the use of "substantial doubt" in Victor's instruction is less problematic. *Ante,* at 20.

A casual reading of the *Cage* instruction reveals the majority's false premise. The *Cage* instruction plainly states that a reasonable doubt is a doubt "founded upon a real tangible substantial basis and not upon mere caprice and conjecture." See 498 U. S., at 40. The *Cage* instruction also used the "substantial doubt" language to distinguish a reasonable doubt from "a mere possible doubt." *Ibid.* ("'A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*'"). Thus, the reason the Court condemned the

"substantial doubt" language in *Cage* had nothing to do with the absence of appropriate contrasting language; rather, the Court condemned the language for precisely the reason it gave: "[T]he words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Id.*, at 41. In short, the majority's speculation that the jury in Victor's case interpreted "substantial" to mean something other than "that specified to a large degree" simply because the word "substantial" is used at one point to distinguish mere conjecture is unfounded and is foreclosed by *Cage* itself.

The majority further attempts to minimize the obvious hazards of equating "substantial doubt" with reasonable doubt by suggesting that, in *Cage*, it was the combined use of "substantial doubt" and "grave uncertainty," "in parallel," that rendered the use of the phrase "substantial doubt" unconstitutional. *Ante*, at 20. This claim does not withstand scrutiny. The Court in *Cage* explained that *both* "substantial doubt" and "grave uncertainty" overstated the degree of doubt necessary to acquit, and found that it was the use of those words in conjunction with the misleading phrase "moral certainty" that violated due process. The Court's exact words were:

> "It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." 498 U. S., at 41.

Clearly, the Court was not preoccupied with the relationship between "substantial doubt" and "grave uncertainty." The

Court instead endorsed the universal opinion of the Courts of Appeals that equating reasonable doubt with "substantial doubt" is improper and potentially misleading in that it overstates the degree of doubt required for acquittal under the reasonable-doubt standard. See, e. g., *Smith* v. *Bordenkircher*, 718 F. 2d 1273, 1276 (CA4 1983) (noting agreement with the "uniformly disapproving" view of the appellate courts regarding the use of the "substantial doubt" language), cert. denied, 466 U. S. 976 (1984); see also *Taylor* v. *Kentucky*, 436 U. S. 478, 488 (1978) ("[Equating 'substantial doubt' with reasonable doubt], though perhaps not in itself reversible error, often has been criticized as confusing").*

In a final effort to distinguish the use of the phrase "substantial doubt" in this case from its use in *Cage*, the majority states: "In any event, the instruction provided an alternative definition of reasonable doubt: a doubt that would cause a reasonable person to hesitate to act." *Ante*, at 20. The Court reasons that since this formulation has been upheld in other contexts, see *Holland* v. *United States*, 348 U. S. 121, 140 (1954), this "alternative" statement makes it unlikely that the jury would interpret "substantial" to mean "to a large degree."

To begin with, I note my general agreement with JUSTICE GINSBURG's observation that the "hesitate to act" language is far from helpful, and may in fact make matters worse by analogizing the decision whether to convict or acquit a defendant to the frequently high-risk personal decisions people must make in their daily lives. See *ante*, at 24 (opinion

---

*Despite the overwhelming disapproval of the use of the phrase "substantial doubt" by appellate courts, some state trial courts continue to employ the language when instructing jurors. See *Bordenkircher*, 718 F. 2d, at 1279 (dissenting opinion) ("As the majority has forthrightly pointed out, a 'good and substantial doubt' instruction has evoked a 'uniformly disapproving' response from appellate courts . . . . Evidently the slight slaps on the wrist followed by affirmance of the convictions have not served the hoped for end of correction of the error *in futuro*").

concurring in part and concurring in judgment). But even assuming this "hesitate to act" language is in some way helpful to a jury in understanding the meaning of reasonable doubt, the existence of an "alternative" and accurate definition of reasonable doubt somewhere in the instruction does not render the instruction lawful if it is "reasonably likely" that the jury would rely on the faulty definition during its deliberations. *Boyde*, 494 U. S., at 380. *Cage* itself contained proper statements of the law with respect to what is required to convict or acquit a defendant, but this language could not salvage the instruction since it remained reasonably likely that, despite the proper statements of law, the jury understood the instruction to require "a higher degree of doubt than is required for acquittal under the reasonable doubt standard." 498 U. S., at 41.

In my view, the predominance of potentially misleading language in Victor's instruction made it likely that the jury interpreted the phrase "substantial doubt" to mean that a "large" doubt, as opposed to a merely reasonable doubt, is required to acquit a defendant. It seems that a central purpose of the instruction is to minimize the jury's sense of responsibility for the conviction of those who may be innocent. The instruction goes out of its way to assure jurors that "[y]ou may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken"; and then, after acquainting jurors with the possibility that their consciences will be unsettled after convicting the defendant, the instruction states that the jurors should feel free to convict based on the "strong probabilities of the case." Viewed as a whole, the instruction is geared toward assuring jurors that although they may be mistaken, they are to make their decision on those "strong probabilities," and only a "substantial doubt" of a defendant's guilt should deter them from convicting.

The majority dismisses the potentially harmful effects of the "strong probabilities" language on the ground that a

"nearly identical instruction" was upheld by the Court a century ago. See *ante*, at 22, citing *Dunbar* v. *United States*, 156 U. S. 185, 199 (1895). But the instruction in *Dunbar* did not equate reasonable doubt with "substantial doubt," nor did it contain the phrase "moral certainty." As the majority appreciates elsewhere in its opinion, challenged jury instructions must be considered in their entirety. *Ante*, at 5, quoting *Holland*, 348 U. S., at 140 (" '[T]aken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury' "). Rather than examining the jury instruction as a whole, the majority parses it, ignoring the relationship between the challenged phrases as well as their cumulative effect.

Considering the instruction in its entirety, it seems fairly obvious to me that the "strong probabilities" language increased the likelihood that the jury understood "substantial doubt" to mean "to a large degree." Indeed, the jury could have a reasonable doubt about a defendant's guilt but still find that the "strong probabilities" are in favor of conviction. Only when a reasonable doubt is understood to be a doubt "to a large degree" does the "strong probabilities" language begin to make sense. A Nebraska Federal District Court recently observed: "The word 'probability' brings to mind terms such as 'chance,' 'possibility,' 'likelihood' and 'plausibility'—none of which appear to suggest the high level of certainty which is required to be convinced of a defendant's guilt 'beyond a reasonable doubt.' " *Morley* v. *Stenberg*, 828 F. Supp. 1413, 1422 (1993). All of these terms, however, are consistent with the interpretation of "substantial doubt" as a doubt "to a large degree." A jury could have a large and reasonable doubt about a defendant's guilt but still find the defendant guilty on "the strong probabilities of the case," believing it "likely" that the defendant committed the crime for which he was charged.

To be sure, the instruction does qualify the "strong probabilities" language by noting that "the strong probabilities of

the case" should be "strong enough to exclude any doubt of his guilt that is reasonable." But this qualification is useless since a "doubt of his guilt that is reasonable" is immediately defined, in the very next sentence, as a "substantial doubt." Thus, the supposed clarification only compounds the confusion by referring the jury to the "substantial doubt" phrase as a means of defining the "strong probabilities" language.

Finally, the instruction issued in Victor's case states that a reasonable doubt "is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, *to a moral certainty*, of the guilt of the accused." In *Cage*, the Court disapproved of the use of the phrase "moral certainty," because of the real possibility that such language would lead jurors reasonably to believe that they could base their decision to convict upon moral standards or emotion in addition to or instead of evidentiary standards. The risk that jurors would understand "moral certainty" to authorize convictions based in part on value judgments regarding the defendant's behavior is particularly high in cases where the defendant is alleged to have committed a repugnant or brutal crime. In *Cage*, we therefore contrasted "moral certainty" with "evidentiary certainty," and held that where "moral certainty" is used in conjunction with "substantial doubt" and "grave uncertainty," the Due Process Clause is violated. 498 U. S., at 41.

Just as in *Cage*, the "moral certainty" phrase in Victor's instruction is particularly dangerous because it is used in conjunction with language that overstates the degree of doubt necessary to convict. This relationship between the "moral certainty" language, which potentially understates the degree of certainty required to convict, and the "substantial doubt," "strong probabilities," and "possibly you may be mistaken" language which, especially when taken together, overstates the degree of doubt necessary to acquit, also distinguishes Victor's instruction from the one challenged in No. 92–9049, *Sandoval* v. *California*. See *ante*, at 7. The

jury instruction defining reasonable doubt in *Sandoval* used the phrases "moral certainty" and "moral evidence," but the phrases were not used in conjunction with language of the type at issue here—language that easily may be interpreted as overstating the degree of doubt required to acquit. In other words, in Victor's instruction, unlike Sandoval's, all of the misleading language is mutually reinforcing, both overstating the degree of doubt necessary to acquit and understating the degree of certainty required to convict.

This confusing and misleading state of affairs leads me ineluctably to the conclusion that, in Victor's case, there exists a reasonable likelihood that the jury believed that a lesser burden of proof rested with the prosecution; and, moreover, it prevents me from distinguishing the jury instruction challenged in Victor's case from the one issued in *Cage*. As with the *Cage* instruction, it simply cannot be said that Victor's instruction accurately informed the jury as to the degree of certainty required for conviction and the degree of doubt required for acquittal. Where, as here, a jury instruction attempts but fails to convey with clarity and accuracy the meaning of reasonable doubt, the reviewing court should reverse the conviction and remand for a new trial. See *Sullivan* v. *Louisiana,* 508 U. S., at 277–288. I would vacate the judgment of the Supreme Court of Nebraska and remand the case.

## II

Although I concur in the Court's opinion in No. 92–9049, *Sandoval* v. *California,* I dissent from the Court's affirmance of the judgment in that case. Adhering to my view that the death penalty cannot be imposed fairly within the constraints of our Constitution, see my dissent in *Callins* v. *Collins,* 510 U. S. 1141, 1143 (1994), I would vacate the sentence of death in *Sandoval.* And, in view of my dissent in *Callins,* I also would vacate the sentence of death in No. 92–8894, *Victor* v. *Nebraska,* even if I believed that the underlying conviction withstood constitutional scrutiny.